**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

DC COMICS, a New York general partnership,

Plaintiff,

v.

THE PARTNERSHIPS and
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE "A",

Defendants.

Case No. 26-cv-06072

**COMPLAINT**

Plaintiff DC Comics ("Plaintiff" or "DC") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

**I. JURISDICTION AND VENUE**

1. This Court has original subject matter jurisdiction over DC's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b), and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief,

1

sell products using infringing and counterfeit versions of DC's federally registered trademarks (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused DC substantial injury in the state of Illinois.

## II. INTRODUCTION

3.      DC filed this case to prevent e-commerce store operators who trade upon DC's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate DC's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal their identities, locations, and the full scope and interworking of their counterfeiting operation. DC is forced to file this action to combat Defendants' counterfeiting of its registered trademarks, as well as to protect consumers from purchasing Unauthorized Products over the Internet. DC has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademarks because of Defendants' actions and therefore seeks injunctive and monetary relief.

## III. THE PARTIES

4.      DC Comics is a New York general partnership and owns the trademark rights asserted herein, which relate to DC's famous Superman franchise.

2

5.      Since his first appearance, the world has been captivated by the story of Superman. Superman, also known by his alias Clark Kent, possesses superhuman strength, the power of flight, invulnerability, super speed, heat vision, freeze breath, x-ray vision, and superhuman hearing. Faster than a speeding bullet, more powerful than a locomotive, Superman fights a never-ending battle for truth, justice and a better tomorrow. From his blue and red costume and flowing red cape, to the "S" in the shield on his chest, Superman is one of the world's most iconic, immediately recognizable and beloved superheroes of all time. Superman is the ultimate symbol of truth, justice and hope.

6.      DC has focused an enormous amount of attention and effort to develop the Superman mythos, including the character, his associates, his surrounding universe, key phrases and other indicia associated with the Superman character and franchise. Superman has been featured in many formats in addition to comic books, including animated television series, live-action television series, newspaper comic strips, video games, motion pictures, and even a Broadway musical.

7.      DC markets and sells a variety of Superman branded products directly or indirectly through affiliated companies, including blankets, action figures, clothing, costumes, jewelry, toys, and other merchandise bearing DC's trademarks (collectively, "Superman Products"). Superman Products have remained enormously popular for decades, driven by DC's quality standards and innovative designs. Among the purchasing public, Superman Products are instantly recognizable as such. Superman Products are distributed and sold to consumers by DC through authorized licensees and retail channels, including through DC's website, www.shop.dc.com.

8.      Many trademarks deriving from the Superman universe are registered with the United States Patent and Trademark Office, and Superman Products typically include at least one

of DC's registered trademarks. DC uses its trademarks in connection with the marketing of Superman Products and Services, including the following registered marks which are collectively referred to as the "Superman Trademarks."

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 2,226,436 | MAN OF STEEL | Feb. 23, 1999 | For: toys, namely, toy vehicles in Class 028. |
| 4,411,861 | MAN OF STEEL | Oct. 1, 2013 | For: action figures and accessories therefor; playsets for action figures; toy vehicles in Class 028. |
| 4,419,423 | MAN OF STEEL | Oct. 15, 2013 | For: digital versatile discs featuring music, comedy, drama, action, adventure, and/or animation; mouse pads; downloadable electronic publications in the nature of books in the field of characters from animated, action adventure, comedy and/or drama features; cellular telephone covers and cellular telephone face covers; and decorative magnets in Class 009. |
| 4,419,425 | MAN OF STEEL | Oct. 15, 2013 | For: printed matter and paper goods, namely, books featuring characters from animated, action adventure, comedy and/or drama features, comic books, graphic novels, children's books, greeting cards, posters; bookmarks in Class 016. |
| 4,522,572 | MAN OF STEEL | Apr. 29, 2014 | For: clothing for men, women and children, namely, t-shirts, sweatshirts, tank tops, hats, caps, and masquerade and halloween costumes and masks sold in connection therewith in Class 025. |
| 1,433,864 | THE MAN OF STEEL | Mar. 24, 1987 | For: comic magazines in Class 016. |

| | | | |
|---|---|---|---|
| 1,182,041 | | Dec. 15, 1981 | For: Books Concerning Memorabilia Relating to Fictional Characters, Children's Books, Coloring Books, Puzzle Books, Nonfiction Books Regarding the Production of Motion Pictures and Television Programs, Greeting Cards, Notepads and Posters in Class 016. |
| 1,182,172 | | Dec. 15, 1981 | For: Bowls, Mugs, and Glasses in Class 021. |
| 1,184,881 | | Jan. 5, 1982 | For: Adults' and Childrens' Clothing-Namely, T-Shirts, Shirts, Swimwear, Shorts, Hats, Bibbs, Aprons, Ties, Rainwear, Jackets, Footwear, Sweaters, and Loungewear in Class 025. |
| 1,189,376 | | Feb. 9, 1982 | For: Towels, Sheets, Pillow Cases in Class 024. |
| 1,197,814 | | Jun. 15, 1982 | For: Earrings and Stick Pins, Made of Precious Metals and Pendents and Tie Tacks in Class 014. |

5

| 1,199,552 | | Jun. 29, 1982 | For: Wallets and Umbrellas in Class 018. |
|---|---|---|---|
| 1,199,630 | | Jun. 29, 1982 | For: Sleepwear for Children in Class 025. |
| 1,199,690 | | Jun. 29, 1982 | For: Yo-Yos, Balls, and Equipment Sold as a Unit for Playing Board Games in Class 028. |
| 2,211,378 | | Dec. 15, 1998 | For: toys and sporting goods, including action figures and accessories therefor; plush toys; balloons; toy vehicles; dolls; and action type target game in Class 028. |
| 2,226,415 | | Feb. 23, 1999 | For: motion picture, video and television films featuring animated and non-animated action, adventure and drama; prerecorded discs featuring animated and non-animated action, adventure, drama, and/or music in Class 009. |

6

| | | | |
|---|---|---|---|
| 4,656,403 | | Dec. 16, 2014 | For: Belt Buckles in Class 026. |
| 5,920,891 | | Nov. 26, 2019 | For: Backpacks in Class 018. |
| 1,140,418 | | Oct. 14, 1980 | For: Hats in Class 025. |
| 1,173,150 | | Oct. 13, 1981 | For: Comic Magazines and Sections of Comic Magazines in Class 016. |
| 394,923 | | May 5, 1942 | For: Magazine Publication in Class 016. |
| 1,221,719 | SUPERBOY | Dec. 28, 1982 | For: Comic Magazines in Class 016. |
| 648,647 | SUPERMAN | Jul. 16, 1957 | For: boys' clothing-namely, playsuits, t-shirts, swimsuits, and caps in Class 025. |
| 1,070,290 | SUPERMAN | Jul. 26, 1977 | For: toy doll figures in Class 028. |
| 1,180,068 | SUPERMAN | Dec. 1, 1981 | For: Jewelry-Namely, Pendants, and Watches and Clocks in Class |

| | | | 014. |
|---|---|---|---|
| | | | For: Earrings Not Composed of Precious Metal in Class 026. |
| 1,182,947 | SUPERMAN | Dec. 22, 1981 | For: All Purpose Sport Bags, Tote Bags, Handbags in Class 018. |
| 1,183,841 | SUPERMAN | Dec. 29, 1981 | For: Towels, Sheets, Pillow Cases, Blankets, Comforters in Class 024. |
| 1,184,822 | SUPERMAN | Jan. 5, 1982 | For: Lunchboxes in Class 021. |
| 1,186,803 | SUPERMAN | Jan. 19, 1982 | For: Toothbrushes, Plastic Bowls, Plastic Mugs, Plastic Glasses in Class 021. |
| 1,189,393 | SUPERMAN | Feb. 9, 1982 | For: Adults' and Childrens' Clothing-Namely, Socks, Pajamas, Rainwear, Night Shirts, T-Shirts, Shorts, Loungewear, Underwear, and Costumes in Class 025. |
| 1,209,668 | SUPERMAN | Sep. 21, 1982 | For: Children's Books, Coloring Books, Puzzle Books, Nonfiction Books Regarding the Production of Motion Pictures and Television Programs, Greeting Cards, Notepads and Posters, Paper Napkins, Paper Tablecloths, Calendars, Cardboard Center Pieces in Class 016. |
| 1,221,718 | SUPERMAN | Dec. 28, 1982 | For: Comic Magazines in Class 016. |
| 3,615,518 | SUPERMAN | May 5, 2009 | For: Sugar Confectionery, Namely, Candy in Class 030. |
| 1,182,226 | | Dec. 15, 1981 | For: Adults' and Childrens' Clothing-, namely, Socks, Pajamas, Rainwear, T-Shirts, Loungewear, and Underwear in Class 025. |

| | | | |
|---|---|---|---|
| 1,183,809 | | Dec. 29, 1981 | For: Mugs, Glasses, Toothbrushes in Class 021. |
| 1,185,853 | | Jan. 12, 1982 | For: Towels, Pillow Cases, Blankets, Comforters in Class 024. |
| 1,189,355 | | Feb. 9, 1982 | For: Lunchboxes in Class 021. |
| 1,200,394 | | Jul. 6, 1982 | For: Books Concerning Memorabilia Relating to Fictional Characters, Children's Books, Coloring Books, Puzzle Books, Greeting Cards, Notepads and Posters, Paper Napkins, Paper Tablecloths, Calendars, Cardboard Center Pieces in Class 016. |
| 1,209,863 | | Sep. 21, 1982 | For: Puppets, Puzzles, Dolls, Model Building Sets Consisting of Toy Character Figures, Toy Vehicles, Kites, Balloons, Child's Play/Disguise Set Consisting of Cape and Costume, Flying Discs, and Equipment Sold as a Unit for Playing Boardgames and Parlor Games in Class 028. |
| 1,220,896 | | Dec. 21, 1982 | For: All Purpose Gym Bags, Tote Bags and Handbags in Class 018. |

| 2,226,026 | | Feb. 23, 1999 | For: comic books in Class 016. |
|---|---|---|---|
| 1,108,577 | | Dec. 12, 1978 | For: comic magazines in Class 016. |
| 371,803 | | Oct. 10, 1939 | For: cartoon strip in Class 016. |
| 391,821 | | Nov. 25, 1941 | For: Magazine Publication in Class 016. |
| 1,178,048 | | Nov. 17, 1981 | For: Books Concerning Memorabilia Relating to Fictional Characters, Children's Books, Coloring Books, Puzzle Books, Poster Books, Greeting Cards, Notepads and Posters, Paper Napkins, Paper Tablecloths, Calendars, Cardboard Center Pieces, Writing Slates in Class 016. |

| | | | |
|---|---|---|---|
| 1,180,292 | | Dec. 1, 1981 | For: Adults and Childrens Clothing-, namely, Shirts, T-Shirts in Class 025. |
| 1,201,149 | | Jul. 13, 1982 | For: Bowls, Mugs, Glasses, Cookie Jars, Toothbrushes in Class 021. |
| 1,200,387 | | Jul. 6, 1982 | For: Jewelry, Watches and Clocks in Class 014. |

| | | | |
|---|---|---|---|
| 1,209,743 | | Sep. 21, 1982 | For: Lunchboxes in Class 021. |
| 1,201,167 | | Jul. 13, 1982 | For: Towels, Sheets, Pillow Cases, Blankets, Comforters in Class 024. |
| 1,235,769 | | Apr. 26, 1983 | For: Toy Doll Figure in Class 028. |
| 1,229,321 | | Mar. 8, 1983 | For: Puzzles, Dolls, Model Building Sets, Kites, Balloons, Battery-Powered Toys, Flying Discs, Inflatable Toys, and Equipment Sold as a Unit for Playing Board Games and Parlor Games in Class 028. |
| 7,160,591 | SUPERMOBILE | Sep. 12, 2023 | For: toys, namely toy vehicles in Class 028. |
| 1,239,506 | KRYPTONITE | May 24, 1983 | For: Clothing-Namely, T-Shirts in Class 025. |
| 2,656,768 | KRYPTONITE | Dec. 3, 2002 | For: toys and sporting goods, including games and playthings -- namely action figures and accessories therefor in Class 028. |

| 1,168,306 | KRYPTO | Sep. 8, 1981 | For: Features of Comic Magazines in Class 016. |
|---|---|---|---|
| 3,061,112 | KRYPTO THE SUPERDOG | Feb. 21, 2006 | For: Toys and playthings--namely, action figures and accessories therefor; plush toys in Class 028. |
| 1,184,702 | LOIS LANE | Jan. 5, 1982 | For: Feature in a Comic Magazine in Class 016. |
| 2,781,372 | LOIS LANE | Nov. 11, 2003 | For: Toys --namely, action figures and accessories therefor; dolls in Class 028. |
| 2,765,711 | SMALLVILLE | Sep. 16, 2003 | For: Toys and sporting goods, including games and playthings - namely, action figures and accessories therefor; dolls in Class 028. |
| 2,768,213 | SMALLVILLE | Sep. 23, 2003 | For: Clothing for men, women and children, namely, t-shirts, sweatshirts in Class 025. |
| 2,809,352 | SMALLVILLE | Jan. 27, 2004 | For: Printed matter and paper goods - namely, books featuring characters from animated, action adventure, comedy and/or drama features, comic books, children's books, magazines featuring characters from animated, action adventure, comedy and/or drama features in Class 016. |
| 2,943,882 | SUPERGIRL | Apr. 26, 2005 | For: Clothing for men, women and children - namely, shirts, t-shirts, sweatshirts, jogging suits, trousers, pants, shorts, tank tops, skirts, dresses, hats, caps, sunvisors, belts, sleepwear, pajamas, lingerie, underwear, boots, shoes, booties, swimwear and masquerade and Halloween costumes and masks sold in connection therewith in Class 025. |

13

| 3,023,091 | SUPERGIRL | Dec. 6, 2005 | For: Athletic bags, backpacks, book bags, duffel bags, gym bags, tote bags, coin purses, knapsacks, umbrellas; wallets in Class 018. |
|---|---|---|---|
| 6,075,522 | SUPERGIRL | Jun. 9, 2020 | For: digital versatile discs featuring music, comedy, drama, action, adventure, and/or animation; mouse pads; blank USB flash drives; accessories for mobile phones, laptops, tablets, namely, protective sleeves, covers, cases, faceplates, fitted plastic films known as skins; decorative magnets; downloadable publications in the nature of books featuring characters from animated, action adventure, comedy and/or drama features, comic books, graphic novels, children's books in Class 009. |

9. The U.S. registrations for the Superman Trademarks are valid, subsisting, and in full force and effect, and some are incontestable pursuant to 15 U.S.C. § 1065. The registrations for the Superman Trademarks constitute *prima facie* evidence of their validity and of DC's exclusive right to use the Superman Trademarks pursuant to 15 U.S.C. § 1057(b) and, in the case of DC's incontestable registrations, the registrations constitute conclusive evidence of their validity and of DC's exclusive right to use said marks pursuant to 15 U.S.C. § 1115(b). True and correct copies of the United States Registration Certificates for the Superman Trademarks, and affidavits of incontestability for the incontestable registrations, are attached hereto as **Exhibit 1**.

10. The Superman Trademarks are exclusive to DC and are displayed extensively on Superman Products and in marketing and promotional materials. The Superman Trademarks are also distinctive when applied to Superman Products, signifying to the purchaser that the products come from or are licensed by DC and are manufactured to DC's high quality standards. Whether

14

DC manufactures the products itself or contracts with licensees to do so either directly or through affiliated companies, DC has ensured that products bearing the Superman Trademarks are manufactured to the highest safety and quality standards.

11. DC's use of the Superman Trademarks has built substantial goodwill in the Superman Trademarks. As such, the Superman Trademarks are famous marks, as that term is used in 15 U.S.C. § 1125(c)(1). The success of the Superman franchise, in addition to the marketing of Superman Products, has enabled the Superman brand to achieve widespread recognition and fame and has made the Superman Trademarks some of the most well-known and world famous marks in the entertainment industry. The widespread fame, outstanding reputation, and significant goodwill associated with the Superman brand have made the Superman Trademarks valuable assets of DC.

12. Products bearing the Superman Trademarks have been the subject of substantial and continuous marketing and promotion. DC has marketed and promoted, and continues to market and promote, Superman Products in commerce to consumers through traditional print media, authorized retailers, social media sites, point of sale material, and DC's website, www.shop.dc.com.

13. DC has expended substantial time, money, and other resources advertising, promoting, and marketing Superman Products. Superman Products have also been the subject of extensive unsolicited publicity due to the success of the Superman brand. As a result, products bearing the Superman Trademarks are widely recognized and exclusively associated by consumers as being high-quality products sourced from DC. The Superman Trademarks have achieved tremendous fame and recognition, adding to the inherent distinctiveness of the marks. As such, the goodwill associated with the Superman Trademarks is of immeasurable value to DC.

15

14. Superman Products are sold only by DC or through authorized licensees and are recognized by the public as being exclusively associated with the Superman brand.

15. Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to DC. On information and belief, Defendants reside and/or operate in foreign jurisdictions and redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

16. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for DC to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, DC will take appropriate steps to amend the Complaint.

## IV. DEFENDANTS' UNLAWFUL CONDUCT

17. The success of the Superman brand has resulted in significant counterfeiting of the Superman Trademarks. Because of this, DC has implemented an anti-counterfeiting program that involves investigating suspicious products on websites and online marketplace listings identified in proactive Internet sweeps. Recently, DC has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms like eBay, Inc. ("eBay"), Roadget Business PTE. Ltd. ("SHEIN"), WhaleCo, Inc. ("Temu"), and Walmart, Inc. ("Walmart"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared

for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

18. Because counterfeit products sold by offshore online counterfeiters do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id*. When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods cost the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

19. Furthermore, online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online

marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders." Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187. Specifically, brand owners are forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order." *Id*. at p. 161.

20.     Defendants have targeted sales to residents to Illinois by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, sell Unauthorized Products to residents of Illinois.

21.     Defendants concurrently employ and benefit from similar advertising and marketing strategies. For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards, Amazon Pay, PayPal, and/or Pex. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish their

18

stores from an authorized retailer. DC has not licensed or authorized Defendants to use the Superman Trademarks, and none of the Defendants are authorized retailers of Superman Products.

22. Many Defendants also deceive unknowing consumers by using the Superman Trademarks within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Superman Products. Other e-commerce stores operating under the Seller Aliases omit using the Superman Trademarks in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Superman Products.

23. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

24. E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

25. Defendants are collectively causing harm to DC's goodwill and reputation because the effect of their unlawful actions taken together amplifies each harm and creates a single negative consumer impression. Defendants' activities, occurring at the same time and in the same retail space and manner as one another, blend together to create a single negative impression on consumers such that they constitute the same occurrence or series of occurrences. The combination

19

of all Defendants engaging in the same illegal activity in the same time span causes collective harm to DC in a way that individual actions, occurring alone, might not.

26.     E-commerce store operators like Defendants communicate with each other through QQ.com chat rooms and utilize websites, like sellerdefense.cn, that provide tactics for operating multiple online marketplace accounts and evading detection by brand owners. Websites like sellerdefense.cn also tip off e-commerce store operators, like Defendants, of new intellectual property infringement lawsuits filed by brand owners, such as DC, and recommend that e-commerce operators cease their infringing activity, liquidate their associated financial accounts, and change the payment processors that they currently use to accept payments in their online stores.

27.     Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite DC's enforcement. E-commerce store operators like Defendants maintain offshore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to DC.

28.     Defendants are working to knowingly and willfully manufacture, import, distribute, offer for sale, sell, and ship Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from DC have, knowingly and willfully used and continue to use the Superman Trademarks in connection with the advertisement, distribution, offering for sale, sale, and shipment of Unauthorized Products into the United States and Illinois over the Internet.

29.     Defendants' unauthorized use of the Superman Trademarks in connection with the advertising, distribution, offering for sale, and/or sale of Unauthorized Products, including the sale and shipment of Unauthorized Products into the United States, including Illinois, is likely to cause,

20

and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming DC.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

30. DC hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

31. This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of the Superman Trademarks in connection with the manufacture, sale, offering for sale, distribution, and/or advertising of infringing goods. The Superman Trademarks are highly distinctive marks and instantly recognizable by the consumers. Consumers have come to expect the highest quality from products manufactured, offered, sold, or marketed under the Superman Trademarks.

32. Defendants have manufactured, sold, offered to sell, marketed, distributed, and advertised, and are still manufacturing, selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of the Superman Trademarks without DC's permission.

33. DC owns the Superman Trademarks. DC's United States registrations for the Superman Trademarks are in full force and effect. On information and belief, Defendants have knowledge of DC's rights in the Superman Trademarks and are willfully infringing and intentionally using infringing and counterfeit versions of the Superman Trademarks. Defendants' willful, intentional, and unauthorized use of the Superman Trademarks is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

21

34. Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

35. DC has no adequate remedy at law and if Defendants' actions are not enjoined, DC will continue to suffer irreparable harm to its reputation and the goodwill of the Superman Trademarks.

36. The injuries and damages sustained by DC have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

37. DC hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

38. Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with DC or the origin, sponsorship, or approval of Defendants' Unauthorized Products by DC.

39. By using the Superman Trademarks in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

40. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

41.     DC has no adequate remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Superman brand if Defendants' actions are not enjoined.

**PRAYER FOR RELIEF**

WHEREFORE, DC prays for judgment against Defendants as follows:

1)     That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a. using the Superman Trademarks or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the manufacture, distribution, marketing, advertising, offering for sale, or sale of any product that is not an approved Superman product or is not authorized by DC to be sold in connection with the Superman Trademarks;

   b. passing off, inducing, or enabling others to sell or pass off any product as a Superman product or any other product produced by or under license from DC, that is not DC's or not produced under the authorization, control, or supervision of DC and approved by DC for sale under the Superman Trademarks;

   c. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of DC, or are sponsored by, approved by, or otherwise connected with DC;

   d. further infringing the Superman Trademarks and damaging DC's goodwill; and

23

e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for DC, nor authorized by DC to be sold or offered for sale, and which bear any of the Superman Trademarks;

2) Entry of an Order that, upon DC's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms, including eBay, SHEIN, Temu, and Walmart, shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Superman Trademarks;

3) That Defendants account for and pay to DC all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Superman Trademarks be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that DC be awarded statutory damages, for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2), of $2,000,000 for each and every use of the Superman Trademarks;

5) That DC be awarded its reasonable attorneys' fees and costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 22nd day of May 2026.        Respectfully submitted,


<u>/s/ Martin F. Trainor</u>
Martin F. Trainor
Alexander Whang
Victor B. Chahin
TME Law, P.C.
10 S. Riverside Plaza
Suite 875
Chicago, Illinois 60606
708.475.1127
martin@tme-law.com
alexander@tme-law.com
victor@tme-law.com

*Counsel for Plaintiff DC Comics*

25